**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DIRK M. HARTSFIELD,**

       **Plaintiff,**

**vs.**                         **Case No. 4:12cv220-SPM/CAS**

**CAROLYN W. COLVIN,**[1]
**Acting Commissioner of Social Security,**

       **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's application for Disability Insurance Benefits (DIB).   After careful consideration of the entire Record, it is recommended that the decision of the Commissioner be affirmed.

---

[1]   Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.   Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this case.

## I. Procedural Status of the Case

On January 22, 2008, Plaintiff, Dirk M. Hartsfield, filed a Title II application for applied for a period of disability and DIB alleging disability beginning June 2, 2007, due to depression, anxiety with agoraphobia, and irritable bowel syndrome (IBS).   R. 11, 84-86. (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   Plaintiff's last date of insured status for disability benefits is December 31, 2012.   R. 11

Plaintiff's claim was denied initially on April 9, 2008, and upon reconsideration on August 15, 2008.   R. 11, 84-88, 96, 98-100.   On September 8, 2008, Plaintiff requested a hearing.   R. 11, 102.   On March 1, 2010, Plaintiff appeared and testified during the evidentiary hearing held in Tallahassee, Florida.   R. 11.   Plaintiff's treating mental health counselor, Richard F. Shepard, testified during the hearing.   R. 30-38.   Ron C. Mayne testified as a vocational expert.   R. 11, 79-82.   Plaintiff was represented by James Kole, an attorney.   R. 11.

On March 26, 2010, the Administrative Law Judge (ALJ), Brendan Flanagan, entered a decision concluding that Plaintiff is not disabled.   R. 11-23.   Plaintiff sought review of the ALJ's decision with the Appeals Council and submitted a memorandum in support.   On February 23, 2012, the Appeals Council denied review of the ALJ's decision.   R. 1-7, 255-56.   On April 30, 2012, Plaintiff filed a complaint and seeks judicial review of the decision.   Doc. 1.   Both parties filed memoranda of law, which have been considered.   Docs. 11 and 14.   After careful consideration of the entire Record, it is respectfully recommended that the decision of the Commissioner be affirmed.

## II. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[2]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status. *See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

An ALJ may make this determination either by applying the Medical-Vocational Guidelines (Grids) or by obtaining the testimony of a vocational expert.   Phillips, 357 F.3d at 1239-40.   "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."   Wilson v. Barnhart, 284 F.3d at 1227.   *See also* Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).   The ALJ is not required, however, to include findings in the hypothetical that the ALJ has properly rejected as unsupported.

*See* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004); McSwain v.

Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

## III.   Findings of the ALJ

In his Decision, the ALJ made several findings relative to the issues raised in this

appeal:

1.  Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2012."   R. 13.

2.  Plaintiff "has not engaged in substantial gainful activity since June 2, 2007, the alleged onset date."   R. 13.

3.  "The [Plaintiff] has the following severe impairments: depression, anxiety and irritable bowel syndrome (IBS)."   R. 13.

4.  "The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   R. 13.

5.  Plaintiff "has the residual functional capacity [RFC] to perform a medium work as defined in 20 CFR 404.1567(c) except [Plaintiff] is limited to work that requires occasional interaction with crowds, public and co-workers.   He is able to concentrate and persist for 2 hour segments.   He is unable to meet fast paced, high production demands (cannot meet production pace)."   R. 15.

6.  Plaintiff "is unable to perform any past relevant work" as a program specialist and accountant, bookkeeper because these jobs require mental demands and pace beyond those established by the RFC.   R. 21.

7.  Plaintiff "was born on February 14, 1957 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date."   R. 21.

8.  Plaintiff "has at least a high school education and is able to communicate in English."   R. 21.

9.  "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Plaintiff] is 'not disabled,' whether or not [Plaintiff] has transferable job skills."   R. 21.

10. "Considering [Plaintiff's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform," sedentary jobs such as "billing clerk," credit clerk," and "appointment setter," with a SVP of 4, for the first two jobs and a SVP of 3 for the third job. R. 22; *see infra* n.5.

11. Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 2, 2007, through the date of this decision." R. 22.

## IV. Issues

Plaintiff argues that the ALJ erred in rejecting the opinion of treating counselor Mr. Shepard; erred in failing to incorporate in his RFC determination credited limitations; erred when he made adverse credibility determinations of Plaintiff; and erroneously found that Plaintiff could perform semi-skilled jobs at step five. Doc. 11 at 12-21. The Commissioner responds that substantial evidence supports the ALJ's rejection of Mr. Shepard's opinion and credibility determination of Plaintiff and that the ALJ properly incorporated Plaintiff's mental limitations in his RFC finding. The Commissioner also argues that the ALJ properly found that Plaintiff could perform other work. Doc. 14 at 13-24.

## V. The Medical and Other Evidence

### A. Relevant Medical Evidence

### Background

Prior to his alleged onset date of June 2, 2007, Plaintiff had a twenty-year history of treatment for IBS that was associated with occasional bouts of alternating periods of constipation and diarrhea and also rectal pain as well as restriction of activity. R. 257-64, 279-80, 295, 297, 300, 302, 304, 306, 308-09, 311, 314, 316, 318-19, 364-66, 418-24,

438, 444-64, 489-91, 501, 507-08, 514, 526, 539; *see* R. 16-20.   He acknowledged the

symptoms could be stress related, and a treating physician noted Plaintiff "is very

consumed with this and I am sure his psychological axis plays a role."   R. 257, 365; *see*

*also* R. 421 (inability to evacuate test material may be psychological rather than physical),

R. 539 (symptoms "clearly combo of IBS and depression").   Plaintiff also sought

treatment from Pain Management Specialists for concurrent chronic rectal/para

coccygeal/buttock peritoneal nerve pain.   R. 278-80, 297, 304.   During the relevant

period (June 2, 2007, through March 26, 2010), treatment for these conditions included a

high fiber diet and laxatives, such as Miralax, when appropriate, and medications, such

as Vicodin and Ultram, as needed for intermittent rectal pain.   R. 292, 365, 418, 444-46,

460, 488, 526.

      In addition to these physical impairments, Plaintiff had a twenty-year history of

treatment for recurrent depression, anxiety, agoraphobia-like symptoms, and alcoholism

"off and on."   R. 297, 302, 304, 306, 311-12, 316, 319, 330-33; *see* R. 16-20.

      **Plaintiff's Evaluations and Treatments**

      Plaintiff began his association with Richard F. Shepard, M.S., L.M.H.C., on

September 19, 2006, when Plaintiff sought counseling for depression, anxiety, and

agoraphobia.   R. 560-62; *see also* R. 16, 18, 20, 561-82, 585-629.   Counseling records

from Mr. Shepard between April 2007 and February 2010 indicate that Plaintiff received

therapy for ongoing symptoms related to depression and anxiety.   Issues related to

depression, constant pain-IBS, and a poor relationship with spouse, money, work, kids,

and retirement are noted beginning in April 2007.   R. 562-82, 585-629.

Mr. Shepard's notes are discussed herein in chronological order along with other evaluation and treatment notes.

On January 2, 2007, Plaintiff's saw his primary care provider, Edward Forester, M.D., reporting worsening depression with occasional suicidal thoughts. Plaintiff reported Celexa was becoming ineffective. R. 302, 304, 306. Plaintiff was encouraged to keep his appointment with the psychiatrist. R. 302. Dr. Forester had previously prescribed various medications in Plaintiff's "long history of waxing and waning with anxiety and depression in the past." R. 312 (Sept. 11, 2006); *see* R. 309, 311, 313, 316, 319, and *infra* n.3.

Plaintiff started receiving psychiatric treatment with Paul Zislis, M.D., on January 16, 2007, and continued to see him through on or about May 6, 2008. R. 273-74, 327-34, 367-71. Plaintiff reported never seeing a psychiatrist before the visit on January 16, 2007, although he had four or five psycho-therapists over the past 20 years. R. 332. Plaintiff was taking Xanax, Ambien, and Darvocet (for rectal pain). Dr. Zislis noted Plaintiff appeared to have a "somatization focus concerning [gastrointestinal] symptoms and in particular obsessive preoccupation with bowel movements and fears" and although he had made initial appointments with psychiatrists, he never kept the appointments because by the time the appointment date arrived he always felt better. Plaintiff reported that his mood had been fairly good overall of late even though he was not currently taking antidepressants. R. 332. Dr. Zislis diagnosed chronic recurrent depression not otherwise specified with somatization features; dysthymia; chronic anxiety and/or panic disorder with agoraphobic-like symptoms; social anxiety; alcoholism; and

obsessive/compulsive personality features; rectal myalgia, sleep apnea. Plaintiff was instructed to continue Xanax and Ambien and was prescribed Celexa. He advised Plaintiff to continue psychotherapy with Mr. Shepard and to "discontinue all alcohol usage." R. 334.

On February 28, 2007, Dr. Forster noted Plaintiff appeared somewhat depressed with a flat, sad affect and encouraged him to follow-up with Dr. Zislis. R. 297.

On March 5, 2007, Plaintiff saw Dr. Zislis and reported Celexa was not helping. He was instead prescribed Wellbutrin and Remeron in addition to Xanax. R. 331.

On April 16, 2007, Plaintiff saw Dr. Zislis and reported Wellbutrin helped for a month and then was no longer effective. Dr. Zislis prescribed an increased dosage of Wellbutrin as Plaintiff did not want a trial of Lamictal. R. 330.

On May 1, 2007, Dr. Forester noted Plaintiff appeared "somewhat subdued with a depressed effect." Anal pain and IBS are reported. Plaintiff was continued on Miralax. R. 295.

On May 16, 2007, just prior to Plaintiff's alleged onset date, Plaintiff presented to the Emergency Room of Tallahassee Memorial Behavioral Health Center (TMH) for the first time on a voluntary basis after having a panic attack at work and for treatment of an exacerbation of chronic depression and resumption of long-standing recurrent alcohol abuse. R. 16, 273-77. He was admitted to the hospital for observation and placed on both suicide and withdrawal precautions. R. 277.

On admission, it was noted that Plaintiff was receiving psychiatric treatment and counseling, but reported that "none of the antidepressants seem to maintain

effectiveness" and resulted in side effects.   He was taking Celexa for a year, but "feels

recently it has not been working" and was experiencing increasing depression and

inability to control his emotions.   R. 276.   Plaintiff was also taking Xanax and drinking six

or fewer beers at night.   Upon evaluation, Plaintiff was noted to be very anxious in

describing his panic attack, with his affect and mood a mixture between anxiety and

depression.   He also reported some suicidal thoughts, but no history of suicide attempts.

R. 276.   Plaintiff was diagnosed on admission with major depression recurrent, rule out

bipolar disorder, and a GAF of about 38.   R. 277.

Plaintiff received inpatient treatment at TMH from May 16 through 19, 2007.

R. 274.   Dr. Zislis noted that Plaintiff sought voluntary admission, but on May 19

demanded discharge to outpatient treatment "stating that as [Dr. Zislis] was his outpatient

treating psychiatrist, [Dr. Zislis] should be able to discharge him as he had admitted

himself on a voluntary basis and now wanted to be discharged to home."   R. 273.   The

discharge diagnosis was chronic recurrent depression not otherwise specified with

somatization features, dysthymia, chronic anxiety/panic disorder with some

agoraphobic-like symptoms, social anxiety, alcoholism; obsessive compulsive

personality features; chronic recurrent rectal myalgias and sleep apnea; chronic stress

and unhappiness with his work situation/environment--the patient cites this as his main

stressor; and estimated GAF scores of 50s to 60s.   R. 274.   Discharge medications

included Celexa and Xanax, with follow-up psychotherapy with Mr. Shepard and

treatment with Dr. Zislis.   R. 274.

On June 4, 2007, Plaintiff was voluntarily admitted to TMH due to escalating symptoms of depression and anxiety to the point he was housebound.   R. 268.   Plaintiff stated he was excessively irritable, and developed suicidal ideations.   R. 268, 270-71. Plaintiff reported having "great difficulty relating to the demands of his job," which he stated was the source of his dissatisfaction and distress.   Plaintiff's spouse and father were supportive of his plans regarding employment that was of "great significance to" Plaintiff, "who felt supported and confident in his capacity to resolve his issue at work." R. 268, 271.

Plaintiff was diagnosed with major depression, moderate, recurrent; dysthymia, primary type, early onset; anxiety disorder, not otherwise specified; alcohol abuse (in remission); personality disorder, not otherwise specified, with avoidant, depressive, negativistic, self-defeating, and paranoid features; and a history of IBS.   Plaintiff's GAF score for the past year was 75 and 65 on discharge.   R. 268.   Plaintiff was prescribed Celexa, Klonopin, Desipramine, Melatonin, and Sam-e, and noted to follow-up with Mr. Shepard for counseling and psychiatric treatment with Dr. Zislis.   R. 269.

On June 18, 2007, Dr. Forester noted Plaintiff appeared depressed with slowed speech.   Dr. Forster noted, as he had in the past, that Plaintiff had a history of rectalgia and IBS.   Plaintiff was taking Miralax and fiber and was to follow-up with Dr. Cottrell at the Digestive Disease Clinic.   R. 292; *see* R. 291, 297-300, 302-04.   (Dr. Cottrell's notes are referred to on pages 18-19, *infra*.)   Dr. Forster reported similar diagnoses in future notes.   *See, e.g.*, R. 289 (Feb. 13, 2008).

On June 25, 2007, Plaintiff saw Dr. Zislis after his discharge from TMH.   R. 329, 371.   Plaintiff reported he was not depressed, but rather having increasing panic attacks and agoraphobia, but was forcing himself to go out of the house to the mall.   Plaintiff stated he did not think he could return to work.   Dr. Zislis noted a May 18, 2007, test "suggested severe exaggeration of pathology to the point of possible malingering." Dr. Zislis discontinued Ambien, Klonopin, and Desipramine and prescribed an increase in Cymbalta.   R. 329, 371; *see* R. 16.

On July 31, 2007, Plaintiff informed Dr. Zislis that he discontinued Zyprexa because it was too sedating.   He reported his "depression is pretty much gone" and his "anxiety was better."   He decided not to return to work, however, because he thought that was the reason he ended up in the hospital.   He was "afraid to go back to work."   R. 329, 370.

On October 30, 2007, Plaintiff reported to Dr. Zislis that he was "doing OK," but his "depression and anxiety and obsessive thoughts have returned" and he was staying in the house and wanting to sleep more.   R. 328, 369.   Although Plaintiff was taking Ambien, he was still not sleeping well because of racing thoughts.   Plaintiff stated he did not think he could return to work.   Dr. Zislis continued Celexa and recommended that Plaintiff restart Remeron.   Plaintiff reported starting daily walks, also at his therapist's recommendation.   R. 328, 369.

On October 30, 2007, Mr. Shepard noted that Plaintiff was fearful of the unknown and that he had a history (by the end of middle school) of being self-conscious.   R. 616.

Plaintiff still liked to browse for guitars and enjoyed talking with people who liked guitars. R. 616.   It is noted that Plaintiff met with Dr. Zislis--"no more meds."   R. 616; *see* R. 17.

On November 28, 2007, Mr. Shepard noted that Plaintiff reported occupying himself with eBay and home projects.   Plaintiff reported Thanksgiving being "a lot better than last year"; "handled it better"; "it was almost enjoyable."   R. 613.   On December 18, 2007, Plaintiff reported doing better and still keeping occupied with home projects, including ripping out carpets for new flooring.   R. 612.

In January 2008, Plaintiff reported being less invested in household projects; having marital difficulties with his wife; growing impatient with staying home; and nervous when he considers trying to go back to work.   Mr. Shepard noted that Plaintiff "is not able to withstand the rigors of 8-5 job given the combination of deep depression and growing agoraphobia."   R. 609.   Other sessions are reported for February and March 2008. R. 609-10; *see* R. 17.

On February 26, 2008, Dr. Zislis noted Plaintiff still "stays homebound," plays guitar, and does housework/home repairs.   He continued to have IBS problems and was taking naps due to feeling weak and tired.   Plaintiff was taking Xanax, Ambien, and Celexa, but was informed he could increase the Celexa dosage.   Plaintiff reported the Remeron was too sedating and he did not want to restart it.   He also reported having some marital stress.   Dr. Zislis diagnosed chronic/recurrent depression, anxiety, and personality disorder, not otherwise specified.   R. 327, 368.

In April 2008, Mr. Shepard encouraged Plaintiff to walk in the neighborhood, despite his agoraphobic fears, and to become more active at home including cooking dinner several nights to modify his symptoms.   R. 610.   Plaintiff is reported as venting regarding medical, psychological, and financial issues.   Plaintiff mentioned that Celexa was not helping with his anxiety.   R. 610; *see* 17.

On May 2, 2008, Plaintiff was "upset with the initial denial from Social Security re: his disability.   [Mr. Shepard u]rged him to simply take the next step."   Plaintiff obsessed about his medical, psychological, and financial issues.   R. 610; *see* 17.

On May 6, 2008, Dr. Zislis changed Plaintiff's medication from Celexa to another medication (illegible) and added Abilify.   Plaintiff still reported paranoia and agoraphobia. Dr. Zislis recommended Plaintiff continue counseling with Mr. Shepard.   R. 367; *see* R. 16.

In June 2008, Mr. Shepard noted that Plaintiff reported being re-involved with little projects and attending his daughter's graduation.   R. 606.   Plaintiff expressed difficulty coping with his wife leaving him.   R. 597-98.   On October 7, 2008, Mr. Shepard advised Plaintiff to stop blaming others and to go affirm his own life.   R. 596; *see* 18.

On September 23, 2008, Plaintiff sought emergency treatment for increased anxiety and was "afraid of everything."   Plaintiff reported that although he was seeing a therapist and a psychiatrist, "nothing is working."   Plaintiff left prior to being seen by a physician because the wait was too long.   R. 473-74, 486.

Plaintiff was voluntarily hospitalized at TMH from September 26 through 29, 2008. Plaintiff reported worsening depression and agoraphobia since his wife moved out four months prior.   R. 406, 410; *see* R. 17.   He stated medication management with Dr. Zislis was not helpful.   Plaintiff also had multiple somatic complaints, found to be consistent with panic attacks as well as a fear of recurrent panic attacks.   R. 406, 410. Plaintiff reported passive suicidal ideation and was observed to have poor eye contact, psychomotor retardation, and slow rate of speech with low volume.   R. 412.   His GAF on admission was 40 and was 60 at the time of discharge.   R. 406.   On discharge, Plaintiff was diagnosed with major depressive disorder, severe, recurrent without psychotic features; history of dysthymia; panic disorder with agoraphobia; alcoholic dependence and sustained remission; and personality disorder not otherwise specified.   Other major diagnoses are noted.   R. 406.   It was noted that Plaintiff should be evaluated for possible benzodiazepine abuse.   R. 406.   Plaintiff's Xanax was discontinued and Klonopin was prescribed instead for the panic disorder.   Plaintiff reported tolerating Klonopin without any side effects and an increased dose in the morning has been helpful. Prozac and Ambien were prescribed at an increased dosage for depression.   Plaintiff reported his use of Trilafon as sedating.   After the new medications were prescribed, Plaintiff reported feeling better and requested discharge.   Plaintiff was encouraged to abstain from alcohol and that he attend AA on a regular basis for continued sobriety. R. 407-08, 413.

Plaintiff was voluntarily admitted to TMH from October 8 through 13, 2008.   He was admitted for evaluation of his symptoms.   R. 414; *see* R. 18.   Plaintiff

reported still being overwhelmed by his wife leaving him.   R. 414-15.   He reported his

depression was worse with the increased Prozac dosage, and he was having suicidal

thoughts, increased panic, increased tearfulness, and paranoia.   Plaintiff was diagnosed

with depressive disorder not otherwise specified and anxiety disorder, and was

discharged with a prescription for Klonopin, Ambien, and Lamictal.   Plaintiff's GAF score

was about 55 on discharge.   It was felt that Plaintiff was stable on discharge and

discharged home with a prescription for Klonopin in the morning, Ambien at night, and

Lamictal, one tablet daily for a week and then two tablets daily.   Follow-up was made

with Dr. Zislis and with Mr. Shepard.   R. 414-16; *see* R. 18.[3]

On November 2, 2008, Plaintiff presented to TMH complaining of rectal pain.   A

diagnosis included anal fissure.   Plaintiff was advised to take sitz baths and was given a

prescription for Medrol.   R. 507-09, 517, 520.

On November 10, 2008, Mr. Shepard noted that Plaintiff reported seeing three

different physicians; in the ER with rectal pain-no organic cause; and with a note that he

may go to Shands.   R. 594.

On December 12, 2008, Plaintiff reported to Mr. Shepard that he walked around

the mall and that he applied for a job "just to see" what would happen.   R. 591.   On

---

[3]   There are several patient and laboratory notes in 2008 and 2009 from various
medical sources, R. 426-40, including a patient note from James W. Cade, M.D., of April
21, 2009, who wanted Plaintiff to follow-up with the specialists at Shands to continue to
work on his problem with rectal pain.   Dr. Cade also suggested a follow-up with Dr. Zislis,
but Plaintiff planned to make an appointment with another psychiatrist.   It appears that
Dr. Cade took over from Dr. Forster as Plaintiff's primary physician.   R. 438.   The record
contains numerous patient notes from health care providers such as Dr. Forster and
others from approximately March 31, 2006, until approximately February 13, 2008.
These notes detail a variety of medical issues, including Plaintiff's IBS.   R. 17-20,
289-320; *see also* R. 459 (James R. Thomas, M.D., CHP office visit, October 23, 2008).

January 5, 2009, Plaintiff reported being frustrated that Dr. Zislis would not render a judgment regarding his disability and a note (from Mr. Shepard) stated that Plaintiff went to Dr. Zislis last week with a quote: "not allowed to render a judgment re: disability." Plaintiff reported going to Shands.   R. 589.

On December 26, 2008, Plaintiff was seen at TMH for complaints of IBS and rectal pain.   R. 523-53; *see* R. 18.   A rectal examination was normal.   R. 538.   Ultram was prescribed and Plaintiff was discharged.   R. 539.

On or about December 29, 2008, Plaintiff was examined at Shands.   R. 418-20; *see* R. 18.   A report was generated by physicians at Shands that includes a summary of Plaintiff's medical history, although the purpose of the visit appears related to Plaintiff's IBS.   The letter/report states in part that "a component of the patient's worsening rectal pain may be caused by the high amount of bran that [Plaintiff] is consuming." Recommendations included a workup for defecography and anal and rectal manometry to better assess his functional status; referral for possible treatments and counseling; decrease in fiber intake; and a follow up in eight weeks.[4]   R. 419-20; *see* R. 18.

Plaintiff had a colonoscopy on March 16, 2006, and the impressions were: colonic mucosa appeared entirely normal; three small sessile polyps were seen in the sigmoid region; and no vascular abnormalities noted.   R. 265, 267, 326.   Pathology results showed "no evidence of acute or chronic colitis or neoplasia."   R. 266.   *See* R. 18, 261-64 (February 14, 2006; 259-60 (January 25, 2007); 257-58 (March 12, 2007); 364-66

---

[4]   Defecography means: "the making of rapid-sequence radiographs or the recording of fluoroscopic images on videotape during defecation following the instillation of barium into the rectum; used in the evaluation of fecal incontinence."   Dorland's Illustrated Med. Dictionary 476 (32d ed. 2012).

(May 1, 2008); 444-46 (October 29, 2008) (patient notes from C. Raymond Cottrell, M.D., and others at the Digestive Disease Clinic re: Plaintiff's IBS/rectal issues).

On February 16, 2009, Plaintiff returned to Shands for a defecography.   R. 421. A rectal examination prior to the exam demonstrated a normal sphincter tone and no hemorrhoids or masses were found.   R. 421.   The procedure was completed and the impression was: "No anatomic explanation for constipation, however, the patient was unable to evacuate the barium paste which may have been psychological rather than physical."   R. 421.

In February and March 2009, Mr. Shepard noted that Plaintiff reported having a few good days, but that he still felt agoraphobic and usually did not go out, unless he pushed himself.   Plaintiff also reported being "just stuck, pretty paralyzed lately." R. 585-86.

On March 9, 2009, Mr. Shepard completed a Florida Retirement System Physician's Report indicating Plaintiff's major depressive disorder and generalized anxiety disorder with agoraphobia resulted in a severe limitation of functional capacity and rendered him "permanently disabled from gainful employment."   R. 583-84.   He commented that Plaintiff was "almost paralyzed with depressive symptoms and high anxiety.   Paranoid thinking has entered the equation."   R. 583-84.

On May 7, 2009, Mr. Shepard noted Plaintiff reported that he was doing better, R. 580, but in July 2009, he reported drinking alcohol again and agoraphobia was worse. R. 573, 575; *see* R. 19.   In August 2009, agoraphobia is reported.   R. 572.   In October 2009, Plaintiff reported that he talked himself "out of liking drinking."   R. 577.   Plaintiff

stated that he felt good and that he walked a lot around stores at the mall.   IBS was still present.   R. 577.

In December 2009, Mr. Shepard noted that Plaintiff said that his physicians were "refusing to support [his] disability."   He was in "a funk again" and "agoraphobia is back." R. 565-66.

On October 6, 2009, Plaintiff switched treatment from Dr. Zislis to Mark K. Poff, D.O.   R. 470-71, 639-41; *see* R. 19.   Dr. Poff diagnosed Plaintiff as having major depressive disorder, recurrent, severe without psychotic features (296.33), and dysthymic disorder (300.4).   R. 471, 640.   Plaintiff admitted that he started drinking again.   R. 471, 640.   Dr. Poff prescribed Seroquel and urged Plaintiff to discontinue his alcohol use and to eat properly.   R. 471, 640.   Dr. Poff's also told Plaintiff that he does not "do disability."   R. 471, 640.

On October 20, 2009, Plaintiff informed Dr. Poff he took one Seroquel that "completely incapacitated" him for two days and he did not want to take any medication although he was still depressed.   Dr. Poff diagnosed major depressive disorder, recurrent, severe without psychotic features; dysthymia; and alcohol abuse.   R. 469, 638; *see* R. 20.

On October 29, 2009, Dr. Poff prescribed Abilify.   Plaintiff was depressed and affect constricted.   Speech was appropriate and Plaintiff was oriented x3.   R. 468, 637.

By November 20, 2009, Plaintiff reported "marked improvement" with Abilify although it resulted in insomnia.   Plaintiff was also prescribed Xanax and Ambien.

R. 467, 636; *see* R. 19.   Dr. Poff noted that Plaintiff's mood was euthymic/norm;

affect-congruent/appropriate; judgment-intact; no hallucinations or paranoia; and short

and long-term memory-intact.   R. 467, 636.

On December 22, 2009, Plaintiff reported to Dr. Poff that Abilify stopped working

and he was having difficulty sleeping with increased agoraphobia.   He admitted having a

couple of drinking binges "of late."   Plaintiff reported doing "rituals" regarding checking

and counting things.   Plaintiff's mood was sad with constricted affect; intact short and

long-term memory; judgment intact; and oriented x3.   R. 20, 466, 635.   Plaintiff was

prescribed Trazodone in addition to Abilify.   By December 30, however, Plaintiff had

discontinued Trazodone, and Celexa was prescribed again at Plaintiff's request.   R. 466,

635.

On February 9, 2010, Plaintiff informed Mr. Shepard that he had not been taking

any of his medications for the past month.   R. 562; *see* R. 20.   Plaintiff reported that he

was doing poorly and that his depression was between 6 and 8 on a 10-point scale.

R. 562.   Plaintiff informed Mr. Shepard that he was returning to Dr. Zislis because he felt

Dr. Poff mostly wanted money.   R. 563.

On or about February 16, 2010, Mr. Shepard wrote a "to whom it may concern"

letter stating that Plaintiff had been saddled with major depressive episodes, significant

anxiety, and periodic alcohol abuse.   R. 560; *see* R. 20.   Mr. Shepard noted he treated

Plaintiff on a monthly basis since September 2006.   He noted Plaintiff left his job due to

mental health symptoms and the frequent absences related to this.   Mr. Shepard opined

that Plaintiff's problems resulted in forced resignation because he was not able to be

productive.   Mr. Shepard opined that Plaintiff would be unable to function in any work environment, even work that was part-time and without interpersonal contact.   R. 560.

Also on February 16, 2010, Mr. Shepard completed a Mental Residual Functional Capacity Checklist.   R. 631-33.   Mr. Shepard indicated that Plaintiff had either marked or extreme "psychiatric restrictions" in all areas of social interaction, sustained concentration or persistence, and adaption.   R. 631-32.   Mr. Sheppard further noted that Plaintiff's condition (anxiety and agoraphobia) would likely increase and depressive reaction will intensify if placed under the stress of a job.   R. 632.

### B.   State Agency, Non-Examining Consultants

On April 8, 2008, non-examining State agency psychologist Jane Cormier, Ph.D., in a Mental RFC Assessment, found that Plaintiff was *moderately* limited in the following abilities: (1) maintain attention and concentration for extended periods; (2) work in coordination with or proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.   In all other areas, Plaintiff was not significantly limited.   R. 357-58; *see* R. 20-21.   Dr. Cormier further opined in her consultant's notes that Plaintiff "appears capable of understanding/completing simple and detailed tasks and of maintaining attention for at least simple tasks"; "may be somewhat avoidant and easily distracted by others but he also appears capable of interacting appropriately with the public and of interacting appropriately with coworkers/supervisors";

and "appears able to recognize work hazards and to adjust to changes in work routine."
R. 359.    Dr. Cormier concluded: "Overall, the claimant appears capable of adequate
adaptation, social functioning and of routine, repetitive tasks on a sustained basis."
R. 359.    Dr. Cormier also opined in a Psychiatric Review Technique (PRT) that Plaintiff
had mild restriction of activities of daily living; moderate difficulties in maintaining social
functioning and maintaining concentration, persistence, or pace; and one or two episodes
of decompensation, each of extended duration.    R. 353; *see* R. 355 (consultant's notes).

On July 8, 2008, Robert Steele, M.D., a non-examining State agency physician, in
a Physical RFC Assessment, opined that Plaintiff could perform *medium* exertional
activity.    R. 372-79; *see* R. 20-21.

On July 31, 2008, a second non-examining State agency psychologist, J. Patrick
Peterson, Ph.D., opined in a Mental RFC Assessment that Plaintiff had *moderate*
limitations in the following abilities: (1) maintain attention and concentration for extended
periods; (2) complete a normal workday and workweek without interruptions from
psychologically based symptoms and to perform at a consistent pace without an
unreasonable number and length of rest periods; and (3) set realistic goals or make plans
independently of others.    R. 394-95; *see* R. 20-21.    In this assessment, Dr. Peterson
opined in his consultant's notes that the medical evidence is contraindicative of the
presence of any diagnosable mental disorder beyond "mild/moderate Adjustment
R[e]action arising w/in a rather anxious/insecure/inadequate/avoidant personality & all
ongoing [treatment services] were confined to a supportive/palliative role."    R. 396.

Dr. Peterson concluded that Plaintiff is "capable of sustaining the mental demands of appropriate concentrated task-oriented activity."   R. 396.   Dr. Peterson also opined in a PRT that Plaintiff had no restrictions of activities of daily living and no episodes of decompensation, each of extended duration; mild difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in maintaining social functioning, and no episodes of decompensation, each of extended duration.   R. 390.

### C.  Plaintiff's Hearing Testimony

Prior to Plaintiff testifying, his counsel argued that Plaintiff meets Listing 12.04 as a result of his psychiatric condition supported by Mr. Shepard's "nearly monthly reports since September of '06."   R. 42.   In the alternative, counsel argued, regarding Plaintiff's his physical condition, that Plaintiff could not perform even sedentary work on a sustained basis because of his "psych condition, but also due to irritable bowel syndrome . . . which results in a [sic] urgency and frequency which would keep him away from his workstation too frequently for him to engage in full-time employment."   R. 43-44.

Plaintiff was born on February 14, 1957, making him 50 years old on his alleged onset date and 53 years old as of the hearing.   R. 45, 138; *see* R. 21.   The Plaintiff graduated from Florida State University (F.S.U.) in 1979 with a B.S. degree and a major in management, business.   R. 46; *see* R. 21.

Plaintiff has been separated from his wife for about two years (since approximately May 2008) at the time of the hearing.   He lives in a single family house with his youngest of two adult daughters and her boyfriend.   His wife works as a bookkeeper at F.S.U. R. 44-47; *see* R.17.

Plaintiff has a driver's license and drives to his doctor's appointments and sometimes to the grocery store. He drove to the hearing. His last trip occurred probably 15 to 20 years ago when he was employed with the State. He does not get out much and avoids travel. He advised that he is agoraphobic. R. 47-48.

Plaintiff stated he had a drinking problem in the past and has attended AA sessions, with his last session during the summer prior to the hearing. Other than attending AA sessions, Plaintiff stated that he had not been treated for alcohol or substance abuse or taken illegal drugs. R. 50.

Plaintiff has changed his primary doctor three times in the last two year and currently sees Dr. Cade for medical issues, although he is "not particularly happy with him." R. 51; *see* R. 16. Plaintiff has a lot of rectal pain with IBS and is taking different pain medications. His physicians are considering whether to refer him to the Mayo Clinic since he has been to Gainesville (Shands). He is "mulling [his] options." R. 51. He goes to the doctor as needed. R. 52.

Plaintiff worked as a program specialist and program manager (performing accounting, bookkeeping, reporting and researching tasks) for the State of Florida and Leon County School Board from 1979 until his alleged disability date, June 2007. R. 52, R. 79-80, 176, 181, 183, 195-98. Plaintiff used sick leave to work part-time starting in February 2007, stopped working in June 2007, and received compensation for accrued leave through August 2007. R. 52, 161, 166, 170. In 2008, Plaintiff applied online for a job (accounting) with the State of Florida without success. R. 52-53.

Plaintiff received unemployment compensation (two or three checks) perhaps in 2002 when he was first "laid off." R. 53-54. Plaintiff clarified that he was dismissed from his job with the State of Florida in 2002 without any reason given. "[I]t was because [he] was depressed. [He] did not fit in. [He] wasn't a good worker. After several months being unemployed, [he] managed through just acquaintances to get a job back with the School Board, where [he] worked before, and [he] didn't fit in there at all, and they fired [him] as soon as the superintendent changed." R. 54. Plaintiff stated he was demoted and put in a lower position--he "had what would have been described as a mental breakdown" that led to one of two of his hospitalizations at the Tallahassee Memorial Behavioral Center. R. 54-55, 77; *see* R. 15. (Plaintiff states he was hospitalized once when he stopped working in January and April 2007 and again in 2008, although the record would indicate when these hospitalizations occurred. R. 77.)

Plaintiff reported that he took care of his own personal needs and that he prepared simple meals (e.g., oatmeal and a can of soup) or picked up fast food. R. 56-57. He stated that he did laundry, washed dishes, and did some cleaning around the house, including sweeping and vacuuming. R. 57. He also cut the grass a couple of times a year with a power mower, R. 57, and occasionally drives over to visit his mother and father. R. 61-62. He stated that on a typical day, he usually stayed home, but that he drove once or twice a week to doctor's appointments or to the grocery store. R. 47, 58. He has four dogs. R. 58. Plaintiff also goes to the library once or twice a month and checks out DVD movies. R. 59. He stated that he also used the computer two or three

times a week to surf the web and to check his email; he watches some television and prefers comedy.   R. 59-60, 78.   He also occasionally plays the guitar.   R. 76.

Plaintiff has managed to pay his bills, although he stated he has had a panic attack when paying bills--it is" [a]n unreasonable fear" and "doesn't make any sense."   R. 63.   It took him days to fill out the disability forms.   R. 63-64.   Lately, Plaintiff states he has difficulty reading--his concentration and memory are poor; "[i]t kind of comes and goes." R. 76, 78.

During the last month or two, Plaintiff reported being physically sick and more depressed.   Before the prior Christmas, Plaintiff was getting up at a reasonable hour, but lately he has had a hard time getting out of bed.   He reports being "in the good bit of physical pain again" and he has had a difficult time dealing with his IBS and with varying but ongoing bouts of constipation and diarrhea.   Sometimes he goes to the bathroom for the entire week and other times not at all for a week.   R. 64; *see* R. 16.   He is taking over-the-counter medication recommended by the gastroenterologist.   He has had accidents perhaps as many as 50 to 100 times.   He considered wearing adult diapers but he feels it is humiliating.   R. 64-69.

Along with his IBS, for two or three months out of the year he has had severe rectal pain brought on by his IBS.   R. 69-70.   His doctors have not offered much except pain medication, although he states that it is "sort of counterproductive because" they are attempting to get his digestive system moving along.   R. 70.   His depression and IBS have gotten worse over the years.   His goal was to work for the State of Florida for 30

years and retire, but he made it 27 years and he does not think he can work the last three years.   R. 70-71.

Plaintiff stated that he has had trouble with depression his entire adult life and has been on more than a dozen different kinds of antidepressants, but not long-term drugs. He stopped taking any antidepressant medications a couple of months ago.   R. 71-72; *see* R. 16.   Prior to stopping, he was taking Celexa and Abilify.   He was not currently taking any prescription medications for his IBS.   He fired one psychiatrist (Dr. Zislis) in the fall prior to the hearing and went to another who he believes was "even worse" so he returned to his prior psychiatrist, Dr. Zislis.   (Plaintiff was treated by Dr. Poff who was in private practice.   He stopped seeing Dr. Poff because he would not support Plaintiff's disability claim.   R. 75-76; *see* R. 16.)   He stopped seeing Dr. Zislis because he was not getting any better "and a lot of it had to do with the fact that he wouldn't support [his] Disability plan."   "It was frustrating.   You go to these doctors, they'll diagnose you as major depressive, but they will not stand by their diagnosis and it's very frustrating. It's extremely frustrating."   R. 72.   Plaintiff stated that he asked Dr. Zislis to sign the paperwork saying he was disabled but, according to Plaintiff, Dr. Zislis told him "that because he was a hospital employee, that he was not allowed to get involved with any Disability determinations."   R. 73.   Plaintiff also said the gastroenterologist also refused to make a disability determination.   R. 73.

Plaintiff again stated he stopped taking his antidepressants a couple months ago because he "was just frustrated.   [He] didn't feel like they were doing [him] any good." R. 74.   He also stated that he had been taking antidepressants for 25 years or so on and

off and also while he was working, although some of these medications are quite

debilitating and "[t]he side effects were horrible." R. 74. He thinks he is more

depressed now and he is returning to Dr. Zislis for an appointment set for the Friday after

the hearing and going to listen to the doctor's recommendation. R. 74-76.

### D. Mr. Shepard's Hearing Testimony

Mr. Shepard, Plaintiff's licensed and treating mental health counselor, appeared at

the hearing and provided testimony at Plaintiff's request. R. 30. Mr. Shepard has a

M.S. degree in social welfare and has been practicing since 1985. He finished his core

class work for a Ph.D., but did not complete a dissertation. R. 30, 37-38.

The ALJ appreciated Mr. Shepard appearing at the hearing and stated, however,

that it was "a little bit unusual" and "a significant event" for a treatment provider such as

Mr. Shepard to appear and testify at a Social Security hearing. R. 30, 37.

The ALJ told Mr. Shepard that he had read his "good comprehensive notes,"

although he stated that the handwriting was "[a] little hard to read sometimes." The ALJ

also stated that he had "a good understanding of what the therapy history has been in the

past, up to more recent things" as well as Mr. Shepard's recent opinion regarding the

extent of Plaintiff's limitations. R. 30-31. The ALJ asked Mr. Shepard about his

statement on December 28, 2009, wherein he stated that Plaintiff's medical doctors

refused to support his disability. R. 31, 565. Mr. Shepard responded that he was not

"commenting on [Plaintiff's] capacity to be seen as disabled by a medical staff," but that

he believed Plaintiff's physicians "refuse to participate in the process" and he did not

"think they were willing to write a letter" because he thought it may be an HMO policy for the psychiatrists not to become involved.   R. 31-32.

Mr. Shepard explained that he did not review all prior psychiatric records from other treatment providers, although he could request access to the information. R. 32-33.   Mr. Shepard was asked, however, about a treatment note (Dr. Zislis) dated June 25, 2007, which referenced the suggestion of a severe exaggeration of pathology to the point of malingering.   R. 33-35, 371 (Exhibit 12F).   Mr. Shepard explained he had not seen the original note, and had not seen any similar notes from other therapists. R. 35-36.   The ALJ again asked Mr. Shepard: "have you ever seen any exaggeration of pathology which made you question the sincerity of his symptoms?"   R. 35-36. Mr. Shepard answered "[a] straightforward answer would be no," and explained that he has

> tried to push him to become more active, get out.   He won't even get out much and walk.   He has something like agoraphobia. . . .Tried to get him to get out some.   One of--he's one of the folks that I would say, try to fight your disorder. And he seems to have a great difficulty of even being able to do that.   There have been times that he's gone out to the mall or gone to the library at my suggestion. He expresses a lot of anxiety in doing that.   He's very uncomfortable.   He's even talked about how he feels kind of floaty, almost like a little bit of unreality.   I don't think he's a psychotic, but a feeling of unreality out there, very uncomfortable.

> I think his last time of employment was three or four or five months after that hypothetical note that we're looking at.   I believe it was probably in September of '07.   He was really unable to function at that work and they wanted him to leave, I think, as much as he was unable to be there.

The ALJ then asked "[a]t work" and Mr. Sheppard responded "[u]h-huh."   R. 36.   The ALJ again expressed his appreciation to Mr. Shepard for coming to the hearing.   R. 37.

Before Plaintiff testified, Plaintiff's counsel advised the ALJ that Mr. Shepard

completed a handwritten letter summarizing Plaintiff's current "circumstances as well as synopsizes his first 6 months of counseling with" him.   R. 42, 560.   Mr. Shepard's office treatment notes are included in the record.   R. 561-629.   Mr. Shepard also completed a Mental RFC Assessment on February 16, 2010, R. 42, 634-40, and a physician's report for the Florida Retirement System dated March 3, 2009.   R. 42-43, 583-84.

### E.  Mr. Mayne's Hearing Testimony

Mr. Mayne, the vocational expert, testified that Plaintiff's past work as a program specialist has a *DOT* number 166.167.050 and a SVP of 6 and account/bookkeeper has a *DOT* number 160.162-026 and a SVP of 8, both at the sedentary level.   R. 79-80. (Semi-skilled work corresponds to an SVP of 3 to 4.   Social Security Ruling (SSR) 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).   Skilled work corresponds to an SVP of 5 to 9. *Id.*)

The ALJ and Mr. Mayne had the following colloquy:

Q   Okay.   Sir, let me have you assume that the claimant has the residual functional capacity to perform the full range of medium work, that is lift or carry up to 50 pounds occasionally, 25 pounds frequently, and stand or walk and sit six hours each in an eight-hour workday, with unlimited push/pull capability, but that he would be able to concentrate and persist for two-hour segments, take a short break of a minute or two and then resume, and would be limited to work that requires occasional interaction with the crowds, public and co-workers, and would be unable to meet production pace.

So could not meet fast-paced, higher production demand--production pace in your jargon.   Assuming these limitations, can the claimant perform any of his past relevant work as actually performed or as generally performed in the national economy?

A   I would say no, Your Honor.

Q   And assume a hypothetical individual with the same past relevant work experience that you've described, and the same age and education of the

claimant, which are approaching advanced age, age 53 now, and a high school or more education. And assume further that the hypothetical individual is capable of working within the following--or with the functional limitations I earlier described, the medium with mental limitations. Are there other jobs that the hypothetical individual could perform in the regional or national economy?

A   I would list a billing clerk and a *DOT* number is 214.362-042 and that would be SVP of 4, sedentary level; national economy 542,000, regional would be 14,648.

Q   Is the region of the state of Florida?

A   That's what I have, yes.

Q   Okay.

A   Uh-huh.

Q   Any others?

A   Credit clerk, *DOT* 205.367-022, sedentary level also, SVP of 4; national economy 69,000, regional economy 4,592.

Q   Are there any other jobs?

A   Appointment setter, *DOT* 237.367-010, sedentary, SVP of 3; national economy is 177,000, regional 8,743.[5]

Q   And, sir, let me have you assume that I find that the claims are fully credible regarding the functional limitations and that the claimant is not capable of performing work at any exertion level on a consistent basis for 8 hours a day, 40 hours a week, or assume I find the claimant has a substantial loss in the ability to perform at least one of the basic mental demands for unskilled work. Would there be any jobs that such a claim could perform?

A   There would be none, Your Honor.

Q   Okay. And is your testimony consistent with the *DOT*, sir?

A   Yes, Your, Honor.

---

5   *See* http://www.occupationalinfo.org/20/205367022.html (credit clerk); http://www.occupationalinfo.org/21/214362042.html (billing clerk); and http://www.occupationalinfo.org/23/237367010.html (appointment clerk) for descriptions of these jobs.

Plaintiff's counsel had no follow-up questions.   R. 80-82.

## VI.  Legal Analysis

### A.  Substantial evidence supports the ALJ's rejection of Mr. Shepard's opinions.

Plaintiff argues that the ALJ did not appropriately evaluate Mr. Shepard's opinion.   Doc. 11 at 12-15.   Mr. Shepard is a mental health counselor and, therefore, not an "acceptable medical source" whose opinion could receive controlling weight as a treating source medical opinion.   20 C.F.R. § 404.1502 (explaining that only acceptable medical sources, described in 20 C.F.R. § 404.1513(a), can be considered treating sources); *see* 20 C.F.R. § 404.1527(a)(2) (explaining that only acceptable medical sources can give "medical opinions").

Notwithstanding, opinions from medical sources who are not acceptable medical sources, such as Mr. Shepard, will be still be considered by the fact finder, as was done in this case by the ALJ.   20 C.F.R. § 404.1513(d)(1); 20 C.F.R. § 404.1527(c); SSR 06-03P, 2006 WL 2329939, at 4-5 (Sept. 9, 2006) (explaining that just as with acceptable medical sources, the Commissioner will look at a number of factors in assessing the weight afforded to opinions from "other medical sources," including the length, nature, and extent of the relationship, the consistency of the opinion with other evidence, and the degree to which the source present relevant evidence to support an opinion).

Plaintiff argues that the ALJ erred because he did not acknowledge that Mr. Shepard testified during the hearing.   Doc. 11 at 13.   The ALJ did not expressly refer to Mr. Shepard's hearing testimony.   It is clear, however, the ALJ was familiar with

Mr. Shepard because during the hearing, the ALJ stated that he had read his "good comprehensive notes," although his handwriting was sometimes hard to read.   The ALJ also stated that he had a good understanding of Plaintiff's therapy history, including Mr. Shepard's recent opinion regarding the extent of Plaintiff's limitations.   R. 30-31. Mr. Shepard clarified some of his treatment notes at the hearing, but did not add anything significant to what he had already stated in his treatment notes.

The ALJ asked Mr. Shepard about his statement made on December 28, 2009, that Plaintiff's physicians (psychiatrists) were refusing to support his disability and Mr. Shepard explained that he was not "commenting on [Plaintiff's] capacity to be seen as disabled by a medical staff," but that he believed Plaintiff's psychiatrists "refuse to participate in the process."   Mr. Shepard did not "think they were willing to write a letter" because he thought it may be an HMO policy for the psychiatrists not to become involved. R. 31-32, 34, 565.

There are notations in the record where Plaintiff reported to Mr. Shepard about being upset because, for example, Dr. Zislis would not render a judgment regarding his disability.   R. 589 (Jan. 5, 2009); 565-66 (Dec. 28, 2009, note stating that Plaintiff's physicians were "refusing to support [his] disability.").   There is also a note from Dr. Poff telling Plaintiff that he does not "do disability."   R. 471, 640.   Nevertheless, Drs. Zislis and Poff and other health care providers provided their evaluations and treatment notes describing their findings and they were considered by the ALJ.   R. 17-20.

Likewise, the ALJ did not err in not addressing Mr. Shepard's testimony that he had never seen any evidence that Plaintiff exaggerated his symptoms.   R. 35-36.   Although

the ALJ did not find Plaintiff's subjective complaints to be fully credible, the ALJ did not find that Plaintiff was a malingerer.   R. 13, 15-16.

Further, the ALJ mentions Mr. Shepard by name and his treatment notes several times in his decision.   R. 16-20 (Exhibit 23F).   Mr. Shepard's hearing testimony was brief and offered little additional evidence to what already appears in his treatment notes and written opinions.   R. 16-20 (Exhibit 23F).

Plaintiff also argues that the ALJ erred when he rejected Mr. Shepard's written opinions that he could not function in any work environment and that he had marked to extreme mental limitations.   R. 560, 583-84, 631-32; *see* Doc.11 at 14.   The ALJ considered Mr. Shepard's opinions.   R. 20.   The ALJ rejected Mr. Shepard's opinion evidence and gave it no probative weight

> because the opinion is not supported by the treating notes and overall evidence of record.   In addition, his opinion is inconsistent with the claimant's own testimony which shows that he is capable of taking care of his activities of daily living including his personal hygiene.   In addition, the opinion is not supported by treating notes which reveal that the claimant has not been consistently taking medications for his mental impairments which the claimant also admitted to at hearing.   His opinion is also contrary to other expert medical opinions refusing to support that the claimant is disabled and whose opinions are more persuasive. See SSR 96-2p.

R. 20; *see* R. 47, 56-62, 76, 327, 577, 591, 606, 612-13, 616 (daily activities).

Substantial evidence supports the ALJ's decision to reject Mr. Shepard's opinion.

### B.   Substantial evidence supports the ALJ's RFC determination.

Plaintiff argues that the ALJ did not properly evaluate Plaintiff's RFC because the ALJ erred in not including Plaintiff's credited limitations in his hypothetical questions posed to Mr. Mayne, the vocational expert.   Doc. 11 at 15-16.   Plaintiff also argues that

the ALJ erred in crediting the opinions of the non-examining State agency psychologists/consultants, Drs. Cormier and Peterson.    R. 20-21, 359, 396; *see supra* at 13-15.

An ALJ can assign great weight to State agency physician opinions where the expert opinions are supported by and consistent with the record as a whole.    Ogranaja v. Comm'r of Soc. Sec., 186 F. App'x 848, 850-51 (11th Cir. 2006); 20 C.F.R. § 1527(e)(2)(i) (explaining that State agency medical and psychological consultants are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluations).

According to the Program Operations Manual System (POMS), an internal SSA document,

> [t]he purpose of section I ("Summary Conclusion") on the SSA-4734-F-SUP is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis.    **It is the narrative** written by the psychiatrist or psychologist **in section III** ("Functional Capacity Assessment") of form SSA-4734-F4-Sup **that adjudicators are to use as the assessment of RFC**.    Adjudicators must take the RFC Assessment in section III and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the mental demands of past work or other work.    This must be done carefully using the adjudicator's informed professional judgment.

SSA POMS, § DI 25020.010B.1 (Sept. 14, 2012).    "The POMS does not have the force of law, but it is persuasive authority."    Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006).

The POMS state, in part, that "[d]ifferent jobs require different degrees of mental ability" and two examples are provided, with the second relevant here.    POMS § DI

25020.010B.5. "Most competitive jobs require the ability to travel to and from work and thus, would be precluded by **extreme agoraphobia** in which the person is incapable of leaving his or her home. However, a mild case of agoraphobia may not preclude the ability to travel to and from work or preclude work performed in the same (and thus, familiar) setting each day." *Id*.

The ALJ found that Plaintiff could perform medium work, except that he "is limited to work that requires occasional interaction with crowds, public and co-workers"; that "he is able to concentrate and persist for 2 hour segments. He is unable to meet fast paced, high production demands (cannot meet production pace)." R. 15. The ALJ made these findings after reviewing the record and summarizing salient portions of the evidence, including patient notes and Plaintiff's hearing testimony. R. 15-21.

The ALJ also reviewed the opinions of the State agency consultants who determined that Plaintiff "retained the physical ability to perform the exertional demands of at least medium work as that term is defined in the regulations (Exhibits 7F, 13F) and that [Plaintiff's] psychiatric problems did not cause more than 'mild' to 'moderate' functional limitations (Exhibits 8F-9F, 14F-15F)." R. 20-21. The ALJ explained the bases for his determination to give these opinions "significant weight." R. 21. The ALJ provided the bases for his RFC assessment:

> In sum, the above [RFC] assessment is supported by the overall evidence of record. The State Agency physicians' opinions show that the claimant is capable of medium exertional work. In addition, the undersigned finds based upon review of the claimant's mental treatment records that while he is moderately impaired with regard to his ability to interact with others, he is capable of occasional contact with co-workers and the general public. This is supported by the claimant's testimony in which he admits he does do things such as go to the grocery store which would expose him to the general public. Lastly, due to the claimant's

problems in dealing with stress, the undersigned finds the claimant is still capable
of doing work as long as it is not work that requires production pace which is [sic]
supports the established [RFC].

R. 21.

Both Drs. Cormier and Peterson concurred that Plaintiff retained the mental

functional capacity to perform the mental abilities needed for any job, notwithstanding

Plaintiff's mild to moderate limitations.   R. 21, 359, 393.   Dr. Cormier, in the "summary

conclusions" portion of her mental RFC assessment, section I, opined that Plaintiff was

not significantly limited in his ability to carry out very short and simple instructions and

ability to carry out detailed instructions.   R. 357.   In her consultant's notes, section III,

Dr. Cormier noted that Plaintiff

appears capable of understanding/completing simple and detailed tasks and of
maintaining attention for at least simple tasks.   The claimant may be somewhat
avoidant and easily distracted by others but he also appears capable of interacting
appropriately with the public and of interacting appropriately with
coworkers/supervisors.   He also appears able to recognize hazards and to adjust
to changes in work routine.   Overall, the claimant appears capable of adequate
adaptation, social functioning and of routine, repetitive tasks on a sustained basis.

R. 359.

Dr. Peterson opined in the "summary conclusions" portion of his mental RFC

assessment, section I, that Plaintiff was not significantly limited in his ability to carry out

very short and simple instructions, but, unlike Dr. Cormier, he further opined that there

was no evidence of any limitation in Plaintiff's ability to carry out detailed instructions.

R. 394.   In his consultant's notes, section III, Dr. Peterson also noted, in part, that Plaintiff

"continues to function quite adequately in a full range of routine ADL's w/ in his physical &

motivational/volitional parameters, including shopping, food prep, pet care, financial

matters, local driving/errands, & enjoying reading, playing guitar, & using his PC, etc; he may likewise be considered still capable of sustaining the mental demands of appropriate concentrated task-oriented activity at this time as well." R. 396.

In making his RFC determination, the ALJ described the relevant portions of the medical and other evidence, including the opinions of the State agency psychologists. R. 15-21. The ALJ gave several reasons for giving significant weight to the opinions of the State agency psychologists and his findings are supported by substantial evidence. R. 21. Based on his review of the record, the ALJ determined Plaintiff's RFC and that determination is supported by substantial evidence. R. 15.

### C. Substantial evidence supports the ALJ's credibility determination.

Plaintiff argues that the ALJ erred when he made his credibility determination of Plaintiff. Doc. 11 at 17-18. In particular, Plaintiff claims that the ALJ did not provide specific reasons for discounting Plaintiff's credibility; erred when he referred to a June 2007 treatment note where Dr. Zislis noted that there had been prior testing that suggested "severe exaggeration of pathology to the point of possible malingering [sic]", R. 16; erred when he relied, in part, on findings of Plaintiff's daily activities, R. 14-16, 21; and erred when he noted that Plaintiff stopped taking his medications at times, R. 19-20. Doc. 11 at 17-18.

In his decision, the ALJ accorded only partial weight to Plaintiff's subjective allegations. The ALJ explained that although the evidence supported some of Plaintiff's physical and mental limitations as a result of impairments, the evidence did not support Plaintiff's allegations that he is totally disabled. R. 16, 21.

In the context of determining whether Plaintiff had an impairment or combination of impairments that met or equaled a listing, the ALJ first considered Plaintiff's activities of daily living, social functioning, and his difficulties regarding concentration, persistence or pace.   R, 15-16.   The ALJ noted, however, that any such limitations are not a RFC assessment, "but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process."   R. 14-15.   The ALJ recognized that the RFC assessment used at steps 4 and 5 requires a more detailed assessment. R. 15.

To determine Plaintiff's RFC, the ALJ discussed Plaintiff's hearing testimony in some detail, noting Plaintiff's view of his limitations and problems associated with IBS and depression.   R. 15-16.   The ALJ also provided a detailed chronology of Plaintiff's medical history.   R. 16-21.

It falls within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence."   Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984).   The credibility of the claimant's testimony must be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).   After considering a claimant's complaints of plain, an ALJ may reject them as not credible.   See Marbury v. Sullivan, 957 F.2d 836, 839 (11th Cir. 1992) (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).   If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's

credibility. *See* Wilson, 284 F.3d at 1225. Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true. *Id.*

The ALJ summarized Plaintiff's treatment history. R. 15-21. Imbedded among the many findings are references to each of the items listed above that Plaintiff asserts are erroneous. Each reference is part of the chronology, not necessarily a feature of the decision. Also, the ALJ did not find that Plaintiff was a malingerer. The ALJ considered Plaintiff's daily activities, which suggested to the ALJ that Plaintiff was capable of performing a range of medium work, with the noted limitations. The activities included occupying himself with home projects, going out to pick up fast food, going to the library, walking around the mall, and using the computer during the week to surf the web, go on eBay, and check his mail. R. 47, 56-62, 776, 327, 577, 591, 606, 612-13, 616; *see* R. 14-16, 20-21. Although Plaintiff argues that these activities are minor, it was not inappropriate for the ALJ to consider them. *See* 20 C.F.R. § 404.1529(c)(3)(i) (noting that daily activities are relevant and can be considered by ALJ in evaluating claimant's symptoms).[6] Although Plaintiff argues that some of his activities, such as going for walk in the mall, were merely therapeutic, they were relevant in terms of showing what Plaintiff could do, especially outside the house.

Likewise, Plaintiff asserts that the ALJ erred when he noted that Plaintiff had "not

---

[6] The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987). *But see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

been consistently taking medications for his mental impairments." R. 20. Treatment measures that a claimant follows or does not follow are also factors that may be considered in evaluating a claimant's credibility. 20 C.F.R. § 404.1529(c)(3)(iv)-(vi). Although Plaintiff suggests that his non-compliance with medications was due to his underlying mental impairment and not voluntary, no physician substantiated this claim.

As noted above, the ALJ crafted a RFC finding that specifically accounted for Plaintiff's credibly established functional limitations. As stated by the ALJ and as noted above, overall, the evidence indicated that Plaintiff was physically capable of performing medium work and that mentally:

> while he is moderately impaired with regard to his ability to interact with others, he is capable of occasional contact with co-workers and the general public. This is supported by the claimant's testimony in which he admits he does do things such as go to the grocery store which would expose him to the general public. Lastly, due to the claimant's problems in dealing with stress, the undersigned finds that the claimant is still capable of doing work as long as it is not work that requires production pace which is [sic] supports the established [RFC].

R. 21. Substantial evidence supports the ALJ consideration of Plaintiff's credibility and subjective complaints.

### D. Substantial evidence supports the ALJ's findings that Plaintiff can perform other work.

Plaintiff argues that the ALJ erroneously found that Plaintiff could perform semi-skilled jobs at step five without determining that Plaintiff had acquired necessary skills during his prior relevant work that would be transferable to new jobs, such as billing clerk, credit clerk, and appointment setter cited by the vocational expert, Mr. Mayne. Doc. 11 at 19-20.

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work as a program specialist, accountant, and bookkeeper because "[t]hese jobs require mental demands beyond and pace beyond those established by the [RFC]." R. 21.   At step five, the ALJ is required to determine whether considering Plaintiff's age, education, work experience, and RFC, there are jobs in the national economy that Plaintiff can perform.

One way for the ALJ and ultimately the Commissioner to carry this burden is through an application of the Medical-Vocational Guidelines, referred to as the Grids. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

> The grids are a series of matrices which correlate a set of variables--the claimant's residual functional capacity (i.e., the ability, despite impairments, to do sedentary, light, etc. work), age, educational background, and previous work experience [including whether the previous work was skilled or unskilled].   Upon entry of a set of these variables into the appropriate matrix a finding of disabled or not disabled is rendered.

Gibson v. Heckler, 762 F.2d 1516, 1520 (11th Cir 1985).

In determining whether exclusive reliance on the Grids is appropriate, the ALJ must first categorize the claimant's impairments as either exertional or non-exertional. *See, e.g.,* Phillips, 357 F.3d at 1241-43.   Exertional impairments affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling.   *Id.* at 1241 n.11.   Non-exertional impairments affect an individual's ability to meet other work-related commands and include limitations such as pain, medication side effects, and depression.   MacGregor, 786 F.2d at 1054.   An ALJ may rely exclusively on the Grids when each factor used in the determination describes the claimant's situation, and when a case involves only exertional impairments.   Foote v.

<u>Chater</u>, 67 F.3d 1553, 1559 (11th Cir. 1995). In contrast, if the claimant has a non-exertional impairment that limits a wide range of work at a given level, an ALJ is required to consult a vocational expert. *Id.*

Table No. 3 of the Grids lists various categories for persons with an RFC to perform "maximum sustained work capability limited to medium work as a result of severe medically determinable impairment(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 3. Each rule has four considerations: age, education, previous work experience, and decision, such as disabled or not disabled. *Id.*

After reciting the general components of the Grids, the ALJ stated that if Plaintiff had the RFC to perform the full range of medium work, a finding of not disabled would be directed by the Grids, and, in particular Rule 203.22, because Plaintiff had a high school education or above, was closely approaching advanced age (age 50-54), and had engaged in previous skilled or semi-skilled jobs without transferable skills. (Plaintiff was 50 years of age as of the alleged onset date, June 2, 2007, and 53 years of age on the date of the ALJ's decision, March 26, 2010.) R. 21.

Notwithstanding, the ALJ found that Plaintiff could not perform a full range of medium work activity and, therefore, consulted Mr. Mayne, a vocational expert, R. 22. *See* <u>Phillips</u>, 357 F.3d at 1240. During the hearing, the ALJ asked Mr. Mayne to assume a person of Plaintiff's age with the same work history education, and the RFC is found by the ALJ. R. 80-81; *see supra* at 31-32. In response, Mr. Mayne testified that the individual could perform work such as a billing clerk, credit clerk, and appointment setter. R. 80-81. The ALJ did not find that Plaintiff had any limitations that affected his ability to

perform semi-skilled work.   Mr. Mayne's testimony provides substantial evidence to support the ALJ's finding that Plaintiff could perform work available in significant numbers in the national economy.   Phillips, 357 F.3d at 1240.

Plaintiff refers to SSR 82-41 (cited by the ALJ, R. 21) to support his argument that the ALJ was required to identify his transferable skills.   Doc. 11 at 21.[7]   The Commissioner argues that SSR 82-41 is only applicable when transferability of work skills is at issue.   Doc. 14 at 23.   Under the facts presented, the Court agrees.   The ALJ appropriately concluded that transferability of job skills was not material to the determination of disability because using the Grids as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.   R. 21. (Under the Grids, Plaintiff was not disabled with or without transferable skills.   20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 3, Rules 203.22 and 203.23).

Plaintiff also cites to SSR 83-10 for the definition of semi-skilled work.   Doc. 11 at 20.   Social Security Ruling 83-10 addresses the capability to do other work under the Medical-Vocational Guidelines, not necessarily when the ALJ relies upon vocational expert testimony.   Moreover, under the Medical-Vocational Guidelines and associated

---

[7]   "The Eleventh Circuit has not decided whether SSR 82-41, 1982 SSR LEXIS 24 requires the identification of transferable skills when the ALJ is not relying solely on the Grids."   Smyre v. Astrue, No. 3:10cv-147-J-JBT, U.S. Dist. LEXIS 8547, *9 (M.D. Fla. Jan. 28, 2011).   Further, the circuit courts have split on the issue whether SSR 82-41 governs when the ALJ does not rely solely on the Grids.   See Kramer v. Astrue, No. 1:10cv-207-JAW, 2011 U.S. Dist. LEXIS 32703, *6-7 (D. Me. Mar. 25, 2011) ("[T]he Second and Ninth Circuits require specific findings on transferable skills even where the [ALJ] relies on the testimony of a vocational expert while the Sixth and Eight Circuits require such findings only when the [ALJ] relies solely on [the Grids]"; Parrott v. Astrue, No. 3:10CV-201-J-34JBT, U.S. Dist. LEXIS 140191, *26 n.8 (M.D. Fla. Dec. 22, 2010) (same); Ripley v. Astrue, No. 2:08-cv-947-Ftm-DNF, 2010 U.S. Dist. LEXIS 52709 (M.D. Fla. Apr. 30, 2010) (same).

regulations, transferability of skills at the medium exertional level does not become an issue unless and until the claimant is at least of advanced age with limited or less education and no previous work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 3, Rules 203.00(b)-(c) and 203.10; *see generally* Lincoln v. Astrue, No. 10-1861, 2012 U.S. Dist. LEXIS 11825, *10 (W.D. La. Jan. 11, 2012) ("transferability of skills at the light exertional level does not become an issue unless and until the claimant is at least closely approaching advanced age and further significantly limited by illiteracy, etc." (citations omitted)).[8]

Substantial evidence supports the ALJ's determination that Plaintiff can perform work in the national economy.

---

[8] "The functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work. Even the adversity of advanced age (55 or over) and a work history of unskilled work may be offset by the substantial work capability represented by the functional capacity to perform medium work. However, we will find that a person who (1) has a marginal education, (2) has work experience of 35 years or more doing only arduous unskilled physical labor, (3) is not working, and (4) is no longer able to do this kind of work because of a severe impairment(s) is disabled, even though the person is able to do medium work." 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 3, Rule 203.00(b)

**VII.    Conclusion**

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.    Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits should be **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on March 29, 2013.


**s/   Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.    A party may respond to another party's objections within 14 days after being served with a copy thereof.    Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**